Nos. 2023-1497, 2023-1498, 2023-1499, 2023-1500

# United States Court of Appeals for the Federal Circuit

TELIT CINTERION DEUTSCHLAND GMBH, f.d.b.a. Thales DIS AIS Deutschland GmbH, HONEYWELL INTERNATIONAL INC., SIERRA WIRELESS, ULC, fka Sierra Wireless, Inc., TCL COMMUNICATION TECHNOLOGY HOLDINGS LIMITED, TCT MOBILE INTERNATIONAL LIMITED, TCT MOBILE, INC., TCT MOBILE (US) INC., TCT MOBILE (US) HOLDINGS, INC.,

*Appellants*

v.

3G LICENSING, S.A.,

*Appellee.*

On Appeal from the USPTO Patent Trial and Appeal Board in *Inter Partes* Review No. IPR2021-00906

**RESPONSE BRIEF OF APPELLEE 3G LICENSING, S.A.**

Timothy Devlin
tdevlin@devlinlawfirm.com
Nadiia Loizides
nloizides@devlinlawfirm.com
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, DE 19806
(302) 449-9010

*Attorneys for Appellee 3G Licensing S.A.*

December 4, 2023

Exemplary Claims of U.S. Patent No. 7,580,388 illustrative of the issues:

Claim 66 (substitute for claim 1):

> A method of transmitting control information from a mobile terminal in a network, the method comprising:
>
> receiving a first message in the mobile terminal, the first message including information indicating at least one available configuration for transmitting a second message, the second message including at least a portion of the control information;
>
> selecting one of the at least one available configuration in the mobile terminal; and
>
> transmitting the second message from the mobile terminal utilizing the selected configuration,
>
> wherein the at least one available configuration is physical random access channel (PRACH) information related to a common control channel (CCCH) logical channel, the information including additional transport format information for the CCCH comprising an additional transport block size.

Claim 69 (substitute for claim 4):

> The method of claim 68, wherein the predefined configuration mode comprises utilizing a new message format;
>
> wherein the new message format adapts a message format by omitting data;
>
> wherein another message is transmitted using the adapted message format; and

[*continued on the next page*]

wherein omitting data includes omitting START values transmitted in a message preceding the another message.

Claim 73 (substitute for claim 12):

The method of claim 66, wherein selecting one of the at least one available configuration comprises selecting a configuration wherein the included additional transport format information and the included additional transport block size are determined by the size of the second message.

Claim 74 (substitute for claim 33):

A mobile communication device for transmitting control information to a network, the mobile communication device comprising:

an RF module configured to receive a first message from the network and to transmit a second message to the network, the first message including information indicating at least one available configuration for transmitting the second message and the second message including at least a portion of the control information;

an antenna configured to receive the first message from the network and to transmit the second message to the network;

a keypad configured to input information from a user;

a storage unit configured to store information associated with the at least one available configuration for transmitting the second message;

a display configured to convey information to the user; and

[*continued on the next page*]

> a processing unit configured to process the first message, select one of the at least one available configuration and transmit the second message utilizing the selected configuration,
>
> wherein the at least one available configuration is physical random access channel (PRACH) information related to a common control channel (CCCH) logical channel, the information including additional transport format information for the CCCH comprising an additional transport block size.

Claim 77 (substitute for claim 36):

> The mobile communication device of claim 76, wherein the predefined configuration mode comprises utilizing a new message format;
>
> wherein the new message format adapts a message format by omitting data;
>
> wherein another message is transmitted using the adapted message format; and
>
> wherein omitting data includes omitting START values transmitted in a message preceding the another message.

Claim 81 (substitute for claim 44):

> The mobile communication device of claim 74, wherein the processor is configured to select one of the at least one available configuration; and
>
> wherein the included additional transport format information and the included additional transport block size are determined by the size of the second message.

Appx62-65.

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2023-1497 (Lead), 23-1498, 23-1499, 23-1500

**Short Case Caption** Telit Cinterion Deutschland GMBH v. 3G Licensing, S.A.

**Filing Party/Entity** 3G Licensing, S.A.

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 12/04/2023

Signature: /s/ Timothy Devlin

Name: Timothy Devlin

**FORM 9. Certificate of Interest** **Form 9 (p. 2)**
**March 2023**

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| 3G Licensing, S.A. | | Sisvel International S.A. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Neil Benchell (Devlin Law Firm) | Stephanie Berger (Devlin Law Firm) | Andrew DeMarco (Devlin Law Firm) |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS


CERTIFICATE OF INTEREST ........ i

TABLE OF AUTHORITIES ........ vi

TABLE OF ABBREVIATIONS ........ viii

STATEMENT OF RELATED CASES ........ 1

JURISDICTIONAL STATEMENT ........ 1

STATEMENT OF THE ISSUES ........ 2

STATEMENT OF THE CASE ........ 2

I. The Parties ........ 2

II. Technology Background ........ 3

III. Asserted Prior Art ........ 6

A. TS-25.331 v6.1.0 ........ 6

B. Bannister ........ 6

C. Beckmann ........ 6

IV. The ’388 Patent ........ 7

A. Background ........ 7

B. Claims At Issue ........ 12

V. Procedural History ........ 13

A. The Original Claims ........ 13

B. Substitute Claims ........ 14

1. Claims 66 and 74 ........ 14

2. Claims 69 and 77 ........ 17

3. Claims 73 and 81 ........ 21

SUMMARY OF THE ARGUMENT ........ 23

ARGUMENT ........ 26

I. Standard of Review ........ 26

II. All Substitute Claims Are Supported by the Original Disclosure ........ 26

A. There Is Ample Written Description Support For “an additional transport block size” Recited In Claims 66 And 74 ........ 27

B. The Board Consistently Applied Its Construction Of "an additional transport block size" To Prior Art ....................................................36

C. The Written Description Supports "another message" And "a message preceding the another message" Recited In Dependent Claims 69 And 77 ....................................................39

III. The Substitute Claims Are Patentable Over Prior Art ....................................................45

A. The Board Correctly Held That Claims 66 And 74 Are Not Anticipated Or Obviated By TS-25.331 ....................................................46

1. TS-25.331 Does Not Anticipate Claims 66 And 74 ....................................................46

2. TS-25.331 Does Not Render Obvious Claims 66 And 74 ....................................................51

B. The Board Properly Considered Bannister's Disclosure ....................................................53

C. Claims 66 And 74 Are Not Obvious In View Of TS-25.331 Combined With Beckmann ....................................................55

D. The Additional Limitations Of Dependent Claims 69 And 77 Are Not Obvious Over TS-25.331 ....................................................58

E. Claims 73 And 81 Are Not Obvious Over TS-25.331 ....................................................62

CONCLUSION ....................................................64

CERTIFICATE OF COMPLIANCE ....................................................65

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acceleration Bay, LLC v. Activision Blizzard, Inc.*,
908 F.3d 765 (Fed. Cir. 2018) ....................37

*Allergan, Inc. v. Sandoz Inc.*,
796 F.3d 1293 (Fed. Cir. 2015) ....................63

*Ariad Pharm., Inc. v. Eli Lilly & Co.*,
598 F.3d 1336 (Fed. Cir. 2010) ....................42

*In re Koller*,
613 F.2d 819 (C.C.P.A. 1980) .................... 35, 42

*In re Wertheim*,
541 F.2d 257 (C.C.P.A. 1976) .................... 35, 42

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007) ....................52

*Leo Pharm. Prods. v. Rea*,
726 F.3d 1346 (Fed. Cir. 2013) ....................59

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004) ....................39

*Lockwood v. Am. Airlines, Inc.*,
107 F.3d 1565 (Fed. Cir. 1997) .................... 31, 41

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
545 F.3d 1359 (Fed. Cir. 2008) .................... 48, 50

*Omega Patents, LLC v. CalAmp Corp.*,
920 F.3d 1337 (Fed. Cir. 2019) .................... 31, 42, 49, 62

*PersonalWeb Techs., LLC v. Apple, Inc.*,
848 F.3d 987 (Fed. Cir. 2017) ....................60

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) .......... 39

*Superguide Corp. v. DirecTV Enterprises, Inc.*,
358 F.3d 870 (Fed. Cir. 2004) .......... 39

*Teva Pharms. Int'l GmbH v. Eli Lilly & Co.*,
8 F.4th 1349 (Fed. Cir. 2021) .......... 26

*Veritas Techs. LLC v. Veeam Software Corp.*,
835 F.3d 1406 (Fed. Cir. 2016) .......... 26

*W. Union Co. v. MoneyGram Payment Sys.*,
626 F.3d 1361 (Fed. Cir. 2010) .......... 52

**Statutes**

35 U.S.C. § 318 .......... 1

37 C.F.R. § 42.73 .......... 1

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| Telit | Appellants collectively |
| 3GL | 3G Licensing, S.A. |
| ’388 patent | U.S. Patent No. 7,580,388 |
| 3GPP | 3rd Generation Partnership Project |
| Board *or* PTAB | The U.S. Patent and Trademark Office’s Patent Trial and Appeal Board |
| BPG | The Board’s Preliminary Guidance (Appx844) |
| CCCH | Common control channel |
| FWD | The Board’s Final Written Decision from December 6, 2022 (Appx1) |
| LG | LG Electronics, the original assignee of the ’388 patent |
| MAC | Medium access control |
| MTA | 3GL’s Contingent Motion to Amend and Request for Preliminary Guidance (Appx621) |
| Original challenged claims | Claims 6, 8, 9, 12, 33-36, 38, 40, 41, 44, 56, 57, 62, and 63 of the ’388 patent |
| PDU | Protocol data unit |
| PRACH | Physical random access channel |
| RACH | Radio access channel |
| RLC | Radio link control |
| RMTA | 3GL’s Revised Contingent Motion to Amend (Appx913) |
| RNC | Radio network controller |
| RRC | Radio Resource Control |
| SRB0 | Signaling radio bearer 0 |
| TB | Transport block |
| UE | User equipment |
| UMTS | Universal Mobile Telecommunications Service |
| UTRAN | UMTS Terrestrial Radio Access Network |

## STATEMENT OF RELATED CASES

These appeals concern the Final Written Decision ("FWD") issued by the U.S. Patent and Trademark Office Patent Trial and Appeal Board ("PTAB" or the "Board") in IPR No. IPR2021-00906 upholding all amended claims (claims 66-85) of U.S. Patent No. 7,580,388 (the "'388 patent") as neither anticipated nor obvious on all asserted grounds of invalidity.

No other appeal in or from the same proceeding was previously before this Court or any other appellate Court. Except for the following matters that also concern the '388 patent, there are no other cases known to counsel to be pending in this or any other tribunal that will directly affect or be directly affected by this Court's decision in this appeal:

*Sisvel Int'l SA v. Honeywell Int'l, Inc.*, 1:20-cv-00652 (D. Del.);

*3G Licensing SA v. TCL Commc'n Tech. Holdings Ltd.*, 1:20-cv-00654 (D. Del.);

*Sisvel Int'l SA v. VeriFone, Inc.*, 1:20-cv-00656 (D. Del.);

*Sisvel Int'l SA v. Xirgo Techs.*, LLC, 1:20-cv-00659 (D. Del.); and

*Sisvel Int'l SA v. HMD Am., Inc.*, 1:20-cv-22051 (S.D. Fla.).

## JURISDICTIONAL STATEMENT

The Board issued its FWD on December 6, 2022, under its jurisdiction to conduct IPR proceedings pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

Appellants ("Telit") filed a timely notice of appeal on February 6, 2023. This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141(c).

## STATEMENT OF THE ISSUES

1. Did the Board commit arbitrary and capricious error or an abuse discretion when rejecting Telit's arguments that the revised amended claims 66, 69, 74, and 77 allegedly introduced new matter and were unsupported by the original written disclosure, where the claims as construed by the Board were disclosed in form and substance in the original specification and applications to which the '388 patent claims priority?

2. Did the Board commit arbitrary and capricious error or an abuse discretion when rejecting Telit's arguments that the revised amended claims 66, 69, 73, 74, 77, and 81 were allegedly anticipated or obviated by prior art?

## STATEMENT OF THE CASE

### I. THE PARTIES

3GL is a world leader in developing and managing intellectual property, including in the wireless 3rd Generation Partnership Project ("3GPP") cellphone arena. 3GL is also a well-known contributor to policy discussions with government bodies on intellectual property matters.

Telit makes and sells cellular products that use 3GL's patented technology, including the '388 patent.

## II. TECHNOLOGY BACKGROUND

The '388 patent generally relates to the Universal Mobile Telecommunications Service ("UMTS") Terrestrial Radio Access Network ("UTRAN"). UTRAN is a radio access network for wireless communications that connects user equipment ("UE"), such as a mobile phone, to a core network. Appx117 (1:46-49, 1:50-53). The interface between the UE and UTRAN's Radio Network Controller ("RNC") is realized through a protocol established in accordance with 3GPP specifications. Appx117 (2:26-29).

Before a UE can send and receive user information (such as calls, text messages, etc.), control information establishing the format of the transmission must be exchanged between the UE and UTRAN. *See* Appx118 (4:1-9, 4:26-29). The Radio Resource Control ("RRC") layer of the protocol handles exchanges of control information and establishes a radio bearer, which is a service provided by the radio link control ("RLC") or medium access control ("MAC") layer for data transfer between the UE and UTRAN. Appx118 (4:3-9). Relevant here is *signaling radio bearer 0* ("SRB0").

A set of channels is used to connect various layers of the protocol and to connect the UE to UTRAN's RNC. Appx117 (2:63-67). There are logical channels (that are defined by the type of information they carry), transport channels (used to transmit control information), and physical channels. *Id.*; Appx118 (4:1-6).

Relevant here are: a *logical channel* called a common control channel ("CCCH") logical channel; a *transport channel* called radio access channel ("RACH") transport channel; and *a physical channel* called the Physical Random Access ("PRACH") channel.

Transmitted data is packetized into data blocks. *See, e.g.*, Appx120 (7:17-21). Relevant here are data blocks called RLC protocol data units ("PDUs"). Transport channels may handle RLC PDUs of predefined sizes. Appx119 (6:12-13). Additionally, to distinguish different bearers and transmissions between the RNC and different UEs at the MAC layer of the protocol, the MAC layer includes a header in the transmissions. Appx119 (5:15-18). The transport block ("TB") size of the physical layer is defined by the RLC PDU size and the MAC header size. Appx119 (6:13-14).

Radio bearers are mapped (*i.e.*, routed along a specific communication path) via a logical channel to a transport channel. Appx119 (6:57-58). Not all existing transport format combinations may be used when mapping a radio bearer. Appx119 (6:57-59). At the time of the '388 patent, if a UE wanted to establish an RRC connection with the network, it was allowed to use only: (i) SRB0 (Appx119 (5:48-50)); (ii) the CCCH logical channel mapped on a RACH transport channel (Appx119 (5:60-6:2)); and (iii) the first transport format that was listed for the selected RACH for transmission of messages via CCCH (Appx119 (6:65-67)). Additionally, only

one transport channel was allowed to be mapped on a PRACH physical channel (Appx119 (6:46-49)), and a RACH transport channel was mapped onto a PRACH (Appx118 (4:35-37)).

The first transport format of a RACH could carry only one transport block of 168 bits. Appx120 (7:1-2). This meant that the first RLC message transmitted via CCCH mapped onto PRACH could not exceed 168 bits, which presented many disadvantages. *Id.* For instance, this was not efficient because messages transmitted via CCCH could be large. Appx120 (7:2-5). Additionally, to fit a message exceeding 168 bits within the transport block size, the UE would delete critical measurement information. Appx120 (7:40-45). For example, the UE could completely delete information on the measured results of neighboring cells, even though UTRAN might need this information (Appx120 (8:30-35)), and without the measurement information, a connection might not be established when the UE moved to a different wireless cell (Appx120 (8:35-37)). As a result, the UE would be unable to transmit data, an ongoing phone call might be interrupted, or a new call might not be initiated. Appx120 (8:37-39). The ’388 patent improved on the prior art and provided methods and systems to overcome those disadvantages.

## III. ASSERTED PRIOR ART

### A. TS-25.331 v6.1.0

The 3GPP standard TS-25.331 v6.1.0, Release 6 (March 2004) ("TS-25.331") discloses the RRC protocol for the UE-UTRAN radio interface. Appx2287. This version of TS-25.331 does not and cannot disclose the inventions of the '388 patent because they were incorporated into a much later version TS-25.331 v6.6.0 at the proposal of the '388 patent's original assignee, LG Electronics. *See* Appx697-708 (discussion of 3GPP's review process of LG's proposal). Rather, it teaches conventional methods and systems. Appx4292-4295.

### B. Bannister

Excerpts from Jeffrey Bannister et al., Convergence Technologies for 3G Networks IP, UMTS, EGPRS and ATM (2004) ("Bannister") summarize known standards and technology, including an unspecified version of TS-25.331. *See, e.g.*, Appx2500; Appx300-301 ("Bannister discloses substantially the same method of transmitting control information . . . as TS-25.331.").

### C. Beckmann

U.S. Patent No. 7,333,443 ("Beckmann") discloses a method for configuring data channels for transmitting data packets via a radio interface of a mobile radio system. Appx2597 (Abstract); Appx2620 (6:18-29). Under Beckmann, the logical channels to be configured are *restricted* and can only use predetermined transport formats contained in the (re)configuration message. Appx2620 (6:18-22). This

suspends the independence of the RB mapping information from the indication of the transport format sets. Appx2620 (6:22-29). The logical channels under Beckmann are restricted to the use of predetermined values of the RLC size parameter. Appx2620 (6:29-31). Thus, Beckmann's approach emphasizes rigidity, which is the opposite of the '388 patent.

## IV. THE '388 PATENT

### A. Background

As discussed above, prior to the '388 patent, a UE was only allowed to use the first transport format that was listed for the selected RACH for transmission of control information in RRC messages via CCCH. Appx119 (6:65-67). The first transport format of a RACH could carry only one transport block ("TB") of 168 bits. Appx120 (7:1-2). This was not efficient because messages to be transmitted via CCCH could be larger (Appx120 (7:2-5)) and because this led to failure to transmit data and loss of connectivity (Appx120 (8:30-39)).

At the time, it was suggested that these problems could be solved by changing the size of the first transport format of the PRACH, but there was no guarantee that all UEs would support a size change of SRB0.[1] Appx120 (8:45-47). Accordingly, there was a need for methods and systems that allowed messages to be transmitted via CCCH that were larger than the then-available TB size of 168 bits, while at the

[1]Only signaling radio bearer SRB0 could use CCCH. Appx119 (5:48-50).

same time not impacting the operation of UEs not supporting a size change. Appx120 (8:52-57).

The ’388 patentees recognized and solved this problem in the art with the claimed methods and systems providing new configurations for transmitting RRC messages of SRB0 via CCCH. Appx103 (Abstract); Appx117 (1:16-24); Appx122 (12:44-52). At the same time, the operation of UEs that did not support the new configurations (a.k.a. “legacy terminals” or “legacy UEs”) would not be impacted under the patented inventions’ designs. Appx120-121 (8:64-9:2). This was accomplished by providing both new configurations for transmitting control information via CCCH and previously-available configurations still available for legacy terminals. Appx121 (9:14-21); Appx121 (9:28-38).

In one aspect, the ’388 patent discloses a method for transmitting control information that includes receiving an information message indicating one or more available configurations for transmitting a message, selecting one of available configurations, and transmitting a message utilizing the selected configuration. Appx121 (9:22-27). The new configurations may include a new message format. Appx121 (9:39-43). Preferably the selection of one of the available configurations is based on the size of a message to be transmitted. Appx121 (9:43-44).

Figure 12 illustrates a method for selecting one of the available configurations according to one embodiment:

**FIG. 12**




Appx112. Notably, at step S102, UTRAN's RNC transmits to the UE information indicating as available both the existing and extended (new) PRACH configurations. Appx123 (13:26-28). At step S104, the UE selects one of the available configurations (Appx123 (13:28-29)), and at step S106, generates a message to be transmitted using the selected configuration (Appx123 (13:29-31)).

Another exemplary embodiment allows mapping the CCCH channel on other TB sizes of the existing RACH. Appx123 (13:5-6). In this embodiment, UTRAN's RNC may signal whether the UE is allowed to map the CCCH on any PRACH and whether any PRACH TB size or only certain PRACH TB sizes are allowed. Appx123 (13:10-13).

Another embodiment (referred to as the fourth embodiment in the specification) illustrates how a new message format may be utilized. Appx123 (13:18-19). The new message format may be adapted to include only the most necessary data. Appx123 (13:19-20). For example, the START values may be omitted in an RRC Connection Request message since the START values are also transmitted in the Initial Direct transfer message. Appx123 (13:20-23).

The information indicating the available PRACH configurations may be transmitted to a UE as an extension of the system information transmitted to a plurality of UEs, for example, as part of a broadcast message on a common channel, as illustrated in Fig. 14 (reproduced below). Appx123 (14:63-67).




Appx114 (fig. 14). As shown in Fig. 14, both UEs supporting new configurations and legacy UEs can read the portion of the message that contains information available according to the then-current 3GPP standards. Appx124 (15:5-9). The

indication of extension information is read by new UEs practicing the invention and ignored by legacy UEs. Appx124 (15:9-10). The extension information indicating the available PRACH configurations is understood only by new UEs that support the new configurations. Appx124 (15:10-13).

The information indicating the available PRACH configurations may also be transmitted by dedicated RRC signaling on a dedicated channel as illustrated in Fig. 15. Appx124 (15:1-4).




Appx114 (fig. 15). Fig. 15 shows that the information indicating the available PRACH configurations is transmitted to a specific new UE that supports the new configurations when a connection between a UTRAN and the UE is established. Appx124 (15:14-17). The existing RRC Connection Setup message is utilized to indicate the available PRACH configurations. Appx124 (15:17-19).

As mentioned above, the inventions of the '388 patent improved upon prior art and were folded into TS-25.331 v6.6.0. *See* Appx697-708.

### B. Claims At Issue

At issue in this appeal are the six substitute claims added during IPR. Claim 66 (substitute for claim 1) reads:

> A method of transmitting control information from a mobile terminal in a network, the method comprising:
>
> receiving a first message in the mobile terminal, the first message including information indicating at least one available configuration for transmitting a second message, the second message including at least a portion of the control information;
>
> selecting one of the at least one available configuration in the mobile terminal; and
>
> transmitting the second message from the mobile terminal utilizing the selected configuration,
>
> wherein the at least one available configuration is physical random access channel (PRACH) information related to a common control channel (CCCH) logical channel, the information including additional transport format information for the CCCH comprising an additional transport block size.

Appx925-926.

Claim 69 (substitute for claim 4) reads:

> The method of claim 68, wherein the predefined configuration mode comprises utilizing a new message format;
>
> wherein the new message format adapts a message format by omitting data;
>
> wherein another message is transmitted using the adapted message format; and

> wherein omitting data includes omitting START values transmitted in a message preceding the another message.

Appx927.

Claim 73 (substitute for claim 12) reads:

> The method of claim 66, wherein selecting one of the at least one available configuration comprises selecting a configuration wherein the included additional transport format information and the included additional transport block size are determined by the size of the second message.

Appx928. Substitute claims 74, 77, and 81 recite systems practicing the methods claimed in substitute claims 66, 69, and 73, respectively, and contain feature changes identical to those claims (Appx928-934).

## V. PROCEDURAL HISTORY

### A. The Original Claims

The Petition asserted five grounds of invalidity against original claims 6, 8, 9, 12, 33-36, 38, 40, 41, 44, 56, 57, 62, and 63: (1) anticipation by TS-25.331; (2) obviousness based on TS-25.331; (3) obviousness based on TS-25.331 combined with Bannister; (4) obviousness based on Beckmann combined with TS-25.331; and (5) obviousness based on Beckmann combined with TS-25.331 and Bannister. Appx295. The Board instituted IPR on all grounds (Appx538), and then invalidated all original challenged claims on Grounds 1 and 2, without reaching Grounds 3—5 (Appx59; Appx99).

### B. Substitute Claims

In parallel with defending the original challenged claims, 3GL brought a Contingent Motion to Amend and Request for Preliminary Guidance ("MTA") (Appx621-653), with feature changes in proposed new claims 66, 69, 73, 74, 77, and 81 to substitute for claims 1, 4, 12, 33, 36, and 44, respectively (Appx630-639). Following the Board's Preliminary Guidance ("BPG"), 3GL brought the operative Revised Contingent MTA ("RMTA") with new feature changes in claims 69 and 77, which the Board granted in full. Appx100.

#### 1. Claims 66 and 74

In both the MTA and RMTA, 3GL proposed adding "an additional transport block size" and removing "at least one of a RLC (Radio Link Control) size . . . or number of transport blocks" in the "wherein" clauses of method claim 66 and system claim 74. Appx631-632; Appx925-926; Appx 635-636; Appx928-930.

Relevant here, in its Opposition to the MTA, Telit argued that the element "additional transport block size" was new subject matter because it did not appear *verbatim* in the prosecution history or patent (Appx785), and that TS-25.331 taught this new limitation because it disclosed that the TB size is related to RLC size (Appx775) and, "[i]f RLC size is known[,] it is at most[] simple math . . . to determine the transport block size given the teachings of TS25.331, the transfer block size = RLC size + MAC header" (Appx776). Bannister allegedly taught this

limitation by describing the transport format having a dynamic part consisting of the TB size and TB set size. Appx782.

In the BPG, the Board found that 3GL "appears to have set forth adequate written description support for proposed substitute claims 66 and 74" and rejected Telit's undeveloped arguments. Appx850-851 ("Satisfaction of written description support does not require the disclosure to use the same term *in haec verba*.") (emphasis original).[2] The Board rejected Telit's anticipation and obviousness argument, explaining that it is not enough that TS-25.331 discloses equations relating TB size to a RLC size because proposed substitute claims 66 and 74 require that (i) "*the mobile terminal/UE receive* the *first message that includes an additional transport block size*[]"; and (ii) "*the UE receive*, *from somewhere else*, transport format information including *an additional transport block size*, while TS-25.331 provides that *the UE itself calculates* an additional transport block size." Appx859-860 (emphasis original). The Board concluded that neither Bannister nor Beckmann anticipate or render obvious claims 66 and 74 because Bannister fails to disclose a UE receiving transport format information including an additional TB size and, at most, Beckmann discloses that TB size is determinable from RLC size. Appx861.

In the RMTA, 3GL further explained that TS-25.331 does not teach or suggest the proposed limitations because it focuses on existing PRACH configurations, *i.e.*,

[2] Unless stated otherwise, all emphasis is added herein.

on the restricted use of the first transport block size of the selected PRACH. Appx935-937; Appx3944-3945 (¶¶ 37-39). 3GL also explained that neither Bannister (which is a summary of an unspecified version of TS-25.331), nor Beckmann (that teaches to restrict the variation of the RLC size) add anything to TS-25.331 that would anticipate or render obvious these claims. Appx940-944.

In its Opposition to the RMTA, Telit for the first time argued that TS-25.331 teaches claims 66 and 74 by disclosing that, in some instances, TB size equals the RLC size (Appx974) and repeated skeletal assertions that these claims contain new subject matter because neither the disclosure nor prosecution history contained *verbatim* the phrase "additional transport block size" (Appx986). In its Reply in support of the RMTA, 3GL explained that calculating the TB size at the UE is different from receiving transport format information including an additional TB size. Appx1076.

In the FWD, the Board again dismissed Telit's lack-of-written-support arguments after considering multiple excerpts from the disclosure, including disclosure of "an increased message block size for an existing channel." Appx67-68 (quoting Appx2220 (¶ 76); Appx2221 (¶ 83)). The Board repeated that the disclosure does not need to use the same words *in haec verba* to show written support. Appx68.

Similar to the BPG, the Board in the FWD found that TS-25.331 does not anticipate these claims (Ground 1) because: (i) TS-25.331 and Section 8.6.5 specifically teaches calculating and not transmitting the TB size; (ii) even when the TB size is set to equal the received RLC size, that still reflects a calculation different from actually transmitting the TB size, which is what the claims require; and (iii) Telit did not account for the fact that proposed claims require transmission of an "additional" TB size and not just a TB size. Appx80-81. The Board also dismissed as improper hindsight Telit's argument (Ground 2) that it would be obvious to a POSITA to modify TS-25.331 to arrive at the invention simply because it "could be" done. Appx81-83.

The Board then held that Bannister did not cure TS-25.331's deficiencies because, as applied by Telit (Ground 3), it was only pertinent to the original claims. Appx83. Last, the Board held that TS-25.331 combined with Bannister and/or Beckmann (Grounds 4 and 5) did not invalidate claims 66 and 74 either because, at best, Telit's arguments indicated that the TB size need not be fixed or is determinable from the RLC size. Appx84.

**2. Claims 69 and 77**

In the MTA, 3GL proposed omitting certain language and adding a new "wherein the new message format adapts the *second* message to omit *one or more*

*START values*" clause in method claim 69 and system claim 77. Appx632-633; Appx636-637.

In its Opposition to the MTA, Telit asserted that the specification does not disclose a second message adapted to omit one or more START values. Appx786-787. Telit also argued that TS25.331 anticipates or renders obvious the proposed revised claims because: (i) it discloses that the UE uses the latest transmitted START value if a security mode command procedure had not been successfully completed (Appx780); and (ii) it defines some elements as optional and that, "even though TS25.331 does not explicitly describe START values as being redundant," a POSITA would allegedly "understand the redundant values could be made optional . . . ." (Appx781). Without citing prior art, Telit also asserted that Beckmann combined with TS-25.331 "teaches 'non-critical' information elements[]" and thus teaches that redundant elements can be omitted. Appx783.

In the BPG, the Board rejected Telit's anticipation and obviousness arguments because TS-25.331 does not disclose omitting START values. The Board concluded that the opposite is true—TS-25.311 teaches that the last transmitted START value is replaced by a newly calculated (new) START value that is determined using the last transmitted (old) START value, and thus it does not disclose that the old and new START values are usable together. Appx862-863. The Board also rejected as conjecture Telit's argument that TS-25.331 teaches that START values could be

optional, explaining that "[t]he information elements that are marked as 'OP – Optional' in TS25.331 *do not include START values*, and the non-critical values and extensions referenced in TS25.331 *do not include START values or START parameters*." Appx863 (citing Appx2364-2365 (tbl. 10.1)) (emphasis original). The Board found, however, that the patent did not provide adequate support for omitting (i) "*one or more*" START values (because the specification does not refer to a single START value); or (ii) for doing that in the "*second* message" (because the RRC Connection Request message is transmitted before the first and second messages (as these messages are named in claims 69 and 77). Appx851; Appx853-854.

Without admitting that the disclosure does not support omitting "one or more" START values, 3GL then submitted the RMTA removing the previously-proposed "wherein" clause and proposing instead to add the following three clauses:

> wherein the new message format adapts a message format by omitting data;
>
> wherein another message is transmitted using the adapted message format; and
>
> wherein omitting data includes omitting START values transmitted in a message preceding the another message.

Appx927; Appx931-932; Appx937-939 (citing in support to the fourth embodiment (Appx123 (13:18-23) and Figure 15 of the patent and pointing out that it was the original patentee that proposed omission of START values to 3GPP and that this proposal was incorporated into a later version of TS-25.331).

Despite the fact that the RMTA recited "omitting START values," another message, and the "message preceding the another message," in its Opposition to the RMTA, Telit continued to argue mainly that the RMTA's claims 69 and 77 contained new subject matter because "[t]he specification does not disclose a *second* message adapted to omit *one or more* START values." Appx987; *see* Appx987-990; *see also* Appx977 (Figure 15 does not support four messages because only three messages are shown); Appx978 (no written support because there are no diagrams), Appx982-983 (asserting TS-25.331 taught that START values were optional).

3GL in its Reply in support of the RMTA, among other things, pointed out that Telit continued to argue about omitting "one or more" START values from the "second" message (Appx1072) and that 3GL cited, not only to the fourth embodiment and Figure 15 of the patent, but also to other portions of the file wrapper as well. Appx1074. 3GL also showed that TS-25.311 does not anticipate or render these claims obvious because it does not teach a causal link between transmitting START values in an earlier message and omitting them in a later message, does not teach that START values are optional, and does not teach that optional values are "omitted" because it may already have been transmitted or will be transmitted again, is unnecessary, not used, or unneeded. Appx1076-1080.

Only in its Sur-Reply opposing the RMTA did Telit belatedly focus on the actual limitations in the RMTA's claims 69 and 77. Appx1214 n.4. But since there

was no way to salvage its previous arguments, Telit asserted—for the first time in the IPR—that the new limitations contained new subject matter and lacked written support because 3GL was allegedly combining two embodiments (first and fourth). Appx1215-1217.

In the FWD, the Board found that these claims have sufficient written description support in the fourth embodiment and Figure 15 of the patent (Appx68-71), dismissed Telit's argument that the RRC Connection Request message cannot be the second message because it was based on Telit's mistaken assumption that the RMTA still proposed the "second" message limitation (Appx71-72), rejected Telit's contention that the "first" message had to be the first in time (Appx73-74), and rejected the belated arguments from Teilt's Sur-Reply as not entitled to consideration and because the fourth embodiment "is not described in stand-alone completeness" but rather added a feature (Appx74-75). The Board dismissed Telit's anticipation and obviousness arguments for the same reasons as with claims 66 and 74. Appx78-85.

### 3. Claims 73 and 81

In both the MTA and RMTA, 3GL proposed adding the limitation "selecting a configuration wherein the included additional transport format information and the included additional transport block size are determined by the size of the second

message" to method claim 73 and corresponding system claim 81. Appx633-634; Appx928; Appx637-638; Appx932-933.

The Board in the BPG found that claims 73 and 81 were narrower in scope because they depended from the narrowed claims 66 and 74 (Appx850) and had sufficient written support (Appx855). It also concluded that Telit failed to show that these claims were anticipated or rendered obvious by any of the asserted references alone or in combination for the same reasons as with claims 66 and 74. Appx864-865.

In the RMTA, 3GL explained that none of the three asserted references anticipated or rendered obvious claims 73 and 81 because of their restrictive use of PRACH configurations and restricting the variation of the RLC size. Appx939-944. In its Opposition to the RMTA, Telit argued (similar to claims 66 and 74) that TS-25.331 taught these claims because it disclosed that in some instances the TB size may equal the RLC size. Appx984. In its Reply in support of the RMTA, 3GL again explained (similar as with claims 66 and 74) that calculating the TB size at the UE is different from receiving transport format information including an additional TB size. Appx1076; Appx1080. Telit did not discuss these claims in its Sur-Reply.

In the FWD, the Board noted that Telit did not assert any statutory arguments (Appx75) and dismissed anticipation and obviousness arguments for the same reasons as with claims 66 and 74 (Appx78-85).

## SUMMARY OF THE ARGUMENT

The Board's decision to grant 3GL's RMTA as to all revised substitute claims was not arbitrary and capricious or an abuse of discretion, and the Board's underlying factual findings were supported by substantial evidence.

Telit presents two main arguments: (i) that the Board correctly construed the "an additional transport block size" limitation in independent claims 66 and 74 but then misapplied that construction to the disclosure and prior art (BB17); and (ii) that substantial evidence did not support the Board's findings that revised substitute claims 66, 69, 73, 74, 77 and 81 are not anticipated or obviated by TS-25.331 alone or in combination with Bannister or Beckmann (BB34). Telit also offers a plethora of unsubstantiated arguments that contradict the record and misunderstand the technology here. None of Telit's arguments has merit.

The Board correctly construed transmitting "an additional transport size" to mean transmitting one more other (or in Telit's words, second) transport block ("TB") size in addition to a conventional TB size. Appx81. And this is exactly the construction the Board applied when it determined that the specification and file wrapper provided sufficient written support (Appx66-68) and when it discussed the prior art (Appx78-85). In its written description analysis, the Board correctly focused on the fact that, at the time of the invention, UEs were only allowed to use a single TB size of 168 bits when transmitting RRC messages of radio bearer SRB0

via CCCH logical channel, and that the size of the first message was therefore limited to 168 bits. Appx119-120 (6:62-7:5). By disclosing new and non-obvious uses of new configurations, the ’388 patent solved the problem of sending larger messages, while at the same time not impacting the operation of legacy UEs not supporting new configurations. Thus, both the conventional and new TB sizes were transmitted simultaneously. *See* Appx66-68.

The Board also correctly found (Appx68-70) that claims 69 and 77 have ample support in the specification, including the fourth embodiment and Figure 15 of the ’388 patent (Appx123 (13:18-23); Appx114 (fig.15)), as well as additional support in the prosecution history. Telit argues that there is no support for START values being contained in a “preceding” message and omitted in a message following the “preceding” message, but the specification and file wrapper support both omitting START values in the message that follows a preceding message carrying START values and vice versa. Telit’s argument that TS-25.331 contradicts the ’388 patent’s disclosure is irrelevant for the written support analysis. And Telit’s argument that the Board ignored the correct sequence of messages is forfeited because it was not raised below and because Telit argued to the Board that the ’388 patent’s specification supports the sequence of messages that it now argues is incorrect.

Next, the Board correctly held that the revised claims are not anticipated (Appx78-81) or rendered obvious (Appx82-83) by TS-25.331 because independent

claims 66 and 74 recite *transmitting*, *i.e.* actually sending, of an *additional* TB size in the first message *from the RNC* to the UE as part of at least one available configuration. Appx925-926; Appx929-930. TS-25.331, in contrast, teaches only that TB size is calculated at the UE based on the values of RNC size (and MAC header) and does not teach transmitting an additional TB size. It would also not be obvious to transmit TB size in lieu of RNC size, as Telit argues, because that would disrupt the functioning of legacy UEs. Additionally, the asserted version of TS-25.331 could not have disclosed the inventions of the '388 patent because 3GPP folded them into a much later version TS-25.331 v6.6.0 at LG's request .

Contrary to Telit's assertions, the Board considered Bannister when analyzing obviousness of relevant dependent claims and ultimately found that neither Bannister nor Beckmann overcame the limitations of TS-25.331. Appx83-84. The Board also correctly held that TS-25.331 does not obviate claims 69 and 74 for the same reasons as with claims 66 and 74 from which they depend. Appx82-83. Additionally, in its more detailed analysis of anticipation and obviousness of claims 69 and 74 in the BPG, the Board explained that "TS25.331 does not disclose that both the prior (latest transmitted) START value and a newly calculated START value *are usable together* and, as such, also does not disclose omission of . . . these START values." Appx862-863.

The Board's holding that TS-25.331 does not obviate claims 73 and 81 for the same reason as with claims 66 and 74 from which they depend (Appx82-83) is correct because below Telit failed to show that TS-25.331 teaches selecting the largest RLC size.

## ARGUMENT

## I. STANDARD OF REVIEW

The Board's decision whether to grant a motion to amend may only be set aside on appeal if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Veritas Techs. LLC v. Veeam Software Corp.*, 835 F.3d 1406, 1413 (Fed. Cir. 2016). Under *Veritas*, factual findings attendant to that decision should be subject to the same arbitrary, capricious, or abuse of discretion standard, but if a substantial evidence standard were to apply to any such findings, it is a deferential standard that requires only that "a reasonable mind might accept the evidence as adequate to support [the] finding." *Teva Pharms. Int'l GmbH v. Eli Lilly & Co.*, 8 F.4th 1349, 1356 (Fed. Cir. 2021) (citation omitted).

## II. ALL SUBSTITUTE CLAIMS ARE SUPPORTED BY THE ORIGINAL DISCLOSURE

The Board did not commit arbitrary and capricious error or an abuse of discretion (*e.g.*, clear factual error) in granting the RMTA when concluding that the proposed amended claims satisfied the written description requirement. Appx67-

75. Telit's appeals fail under the substantial evidence standard of review too because the Board's underlying factual findings have ample support in the record.

### A. There Is Ample Written Description Support For "an additional transport block size" Recited In Claims 66 And 74

Contrary to Telit's arguments, the Board correctly held that the limitation "an additional transport block size" was adequately supported under § 112 and did not introduce new matter. There was also no inconsistency in the Board's application of "an additional transport block size" to the prior art.

To begin, there is no dispute that the Board correctly gave the term "an additional transport block size" in claims 66 and 74 its plain and ordinary meaning. As the Board explained:

> [P]roposed substitute claims 66 and 74 require transmission of "additional transport block size," not just "a transport block size." *The term "additional transport block size" plainly requires that there be one other transport block size, with respect to which the transmitted "additional transport block size" is deemed "additional."*

Appx81. Telit offers the same construction on appeal. BB20 ("[T]he further adjective 'additional' refers to a second [TB] size being transmitted in addition to the originally claimed '[TB] size' . . . ."). And for good reason—the limitation "additional transport block size" meaning additional, other, or second TB size transmitted in addition to the then-current TB size of 168 bits has ample written description support.

As explained above (*supra* Statement of the Case II-IV), prior to the '388 patent's inventions, UEs transmitting RRC messages of SRB0 via CCCH were only allowed to use the first transport format of RACH that could carry a single TB of 168 bits. Appx119 (6:65-67); Appx120 (7:1-2). This meant that UEs were restricted to always use the TB size of 168 bits, and therefore the size of the first message was also limited to 168 bits. Appx119-120 (6:62-7:5); Appx3944-3945 (¶ 38).

The patent disclosed methods and systems with new configurations that allowed sending larger RRC messages of SRB0 via CCCH, that at the same time did not impact the operation of legacy UEs not supporting new configurations and size changes. Appx120 (8:52-58). As the specification discloses, additional TB sizes are used in addition to, and not instead of, the 168-bit TB size. For example, the specification recites:

> Generally, the first transport format of a RACH may carry only one transport block of 168 bits. However, the messages that are transmitted via the CCCH may be large and, in some situations, it may be beneficial to *use also* [*i.e.*, in addition] other transport block sizes.

Appx120 (7:1-5).

Next, Figure 14 discloses how control information about several TB sizes may be transmitted simultaneously by using an extension mechanism. Appx123 (14:63-66). As illustrated by Figure 14 (reproduced below), the first portion of the message containing information available according to the then-current 3GPP standard would

be understood by both new UEs (supporting the new configurations) and by legacy UEs (not supporting the new configurations). Appx124 (15:5-9). The indication of extension information indicating the available PRACH configurations would be read by new UEs and ignored by legacy UEs. Appx124 (15:9-13). Thus, the message would carry information about the 168-bit TB size and other TB sizes that legacy UEs could not use. *See* Appx120 (7:1-5).




Appx114 fig.14.

As depicted below, comparing Figure 10 of the '388 patent (illustrating prior art) and Figure 12 (showing an embodiment) also confirms that extended PRACH configurations are sent in addition to, and not in lieu of, the existing PRACH configurations:

FIG. 10
Related Art




Appx110.

FIG. 12




Appx112.

In Figure 10, at step S10 a conventional RNC transmits only then-available PRACH configurations. Appx110; Appx120 (7:36-37). Based on the then-existing transport PRACH configurations, the UE selects the PRACH according to an algorithm (S12), generates a message including all information elements for transmission over the PRACH (S14), and then adapts the message size by deleting measurement information until the message fits within the conventional TB size (S16). Appx120 (7:38-45). In contrast, in Figure 12, at step S102, RNC "indicate[s] existing PRACH configuration *and* extended PRACH configurations." Appx112.

The Board also carefully considered relevant parts of the file wrapper, focusing on the disclosure of new configurations and an increased message size. *See* Appx67-68 (acknowledging that 3GL in the RMTA directed the Board to Appx2221 (¶¶ 83-84), Appx2227 (¶ 124), Appx2229 (¶ 131), Appx1944, Appx1945, Appx1994,

Appx1995 & fig.10, Appx2013-2014, and Appx2013 (fig.12)). It also considered the purpose of the ’388 patent of allowing transmission of larger messages while not impacting the operation of legacy UEs, to which 3GL drew the Board’s attention throughout the IPR. Appx68. Thus, the Board’s finding of sufficient written support was not arbitrary, capricious, or an abuse of discretion, nor was it lacking substantial evidentiary support.

Telit’s argument that the specification does not provide sufficient written description is unavailing. First, the argument is forfeited because Telit never developed it below. *See Omega Patents, LLC v. CalAmp Corp.*, 920 F.3d 1337, 1343 (Fed. Cir. 2019). Telit provided only conclusory statements that claims 66 and 74 contain new subject matter because the element “additional transport block size” cannot be found *verbatim* in the prosecution history or patent (Appx772; Appx785-786; Appx986) and that the term was supposedly indefinite because it is not described in the specification (Appx790; Appx990-991). The Board rejected that argument and explained that the exact terms are not required to be used *in haec verba* to satisfy the written description requirement. Appx86 (citing *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997)). As shown above, this is exactly the case here—the specification set forth an equivalent description of the claimed subject matter, although it did not describe it in the same exact terms. Telit

also cannot now expand on that "*in haec verba*" argument substantively to challenge the Board's decision because it failed to do so below.

Second, Telit likewise forfeited its argument that portions of the specification using phrases like "an increased message block size for an existing channel" and "an increased message size" (on which 3GL relied below) disclose only that a *message* "may include a new message format with an increased overall message size," which "could be accomplished in many ways, not necessarily by increasing the [TB] size," "[f]or example, the RLC size could be increased." BB21. As the Board correctly concluded, Telit failed to address any of the portions of the original disclosure referenced by 3GL (*e.g.*, Appx926) as providing written description support for "additional transport block size." *See* Appx68.

Telit's position does not have merit in any event. As explained, a POSITA would understand that Telit's excerpts of the specification disclose additional TB sizes because, under the then-current 3GPP standards for RRC messages of SRB0 transmitted via CCCH, the message size was limited to the first TB size of 168 bits. Appx119-120 (6:62-7:5); Appx3944-3945 (¶ 38). The specification also repeatedly emphasizes the connection between the message size and the TB size. *E.g.*, Appx121 (9:43-44) ("Preferably the selection of one of the available configurations is based on the size of a message to be transmitted."). And the specification discloses that conventional methods would adapt the size of the message transmitted over

CCCH by deleting measurement information so that the RLC PDU with the MAC header would fit inside the TB. Appx120 (7:29-32; 7:41-45).[3]

Third, while admitting that 3GL relied on a portion of the specification that expressly refers to other TB sizes ("[t]he extended PRACH configurations may incorporate . . . mapping of the CCCH channel on other transport block sizes of the existing RACH," Appx123 (13:40-49)), Telit nonetheless argues that "the disclosed transmission merely indicates to the UE that it is permitted to select a block size other than that provided by the existing RACH channel (e.g., use a transport block size larger than 168 bits)." BB22. However, as discussed above, prior to the '388 patent, UEs were only allowed to use the first transport format of RACH that could carry one 168-bit TB to transmit RRC messages of SRB0 via CCCH. Appx119-120 (6:65-7:2). And legacy terminals did not support new configurations under the '388 patent but still were able to function because the '388 patent's available configurations included a legacy configuration mode and legacy configuration identity for transmitting messages. Appx121 (9:28-33). Thus, the specification disclosed the first transport format of RACH with one 168-bit TB and additional TB sizes for new UEs. Appx121 (9:22-38).

[3] Telit also failed to explain why increasing the RLC size independently from the TB size would undermine the Board's conclusions, especially considering that Telit argued below and in its Opening Brief that the TB size is calculable from the RLC size (TB size = RLC size +MAC header) and that it some situations the TB size equals the RLC size. *See, e.g.*, BB36.

Fourth, Telit argues that the Board improperly relied on two portions of the specification discussing "increased message block size" and "a need for a method and apparatus . . . that allows messages to be transmitted via the CCCH channel that are larger than the currently available transport block size, while not impacting the operation of [legacy terminals]." BB22-23 (quoting Appx120 (8:51-59)). This argument fails for the same reasons as Telit's second and third arguments. There was nothing improper here because of the connection between the message and TB size.

Furthermore, Telit discusses (at BB20-23) only six excerpts from U.S. App. No. 11/065,872 that issued as the '388 patent—four cited by 3GL (Appx2221 (¶ 83); Appx2221 (¶ 84); Appx2227 (¶ 124); Appx2229 (¶ 131)) and two by the Board (Appx69). BB21-23. However, 3GL provided numerous other cites to the record showing written description support, including excerpts that expressly refer to "additional block size" and explain that there is a "choice" of the block size (which means that there are at least two block sizes to choose from). *See* Appx926. For example, 3GL cited to the following excerpts from U.S. App. No. 60/576,214 to which the '388 patent claims priority:

- "A system where messages are sent from the UE to a network that *can use different block sizes* of the channel on which the message is transmitted . . .";
- "A system that does *the choice of . . . the block size* of the channel . . . *according to the size of the message transmitted*";

> - "A system where the *network informs the UE that it is allowed to use* an . . . *additional block size* . . . according to the above by dedicated or common signaling [sic]"

Appx1944; *see also* Appx1945. And 3GL also cited to U.S. App. No. 60/589,630 from which the '388 patent claims priority:

> "For all above possibilities the UE also needs to choose between using the existing transport format of the PRACH that it has chosen and *the newly introduced possibility* of either choosing a new transport format or another transport format. One way of choosing this can be based [sic] on the size of the message that is to be transmitted. This means that the UE would need to check which is the best transport format to be used, *i.e. choose the transport block size that can carry all data* of the message and that adds minimum amount of overhead."

Appx1994; *see also* Appx2013-2014 (similar disclosure); Appx1995 & fig.10; Appx2013 (fig.12).

It is well accepted that a satisfactory description may be found in originally-filed claims or any other portion of the originally-filed specification. *See, e.g.*, *In re Koller*, 613 F.2d 819, 821 (C.C.P.A. 1980) (considering the written description in the parent application); *In re Wertheim*, 541 F.2d 257, 261 (C.C.P.A. 1976). Thus, U.S. App. Nos. 60/576,214 and 60/589,630 to which the '388 patent claims priority should be considered in the written description analysis. Moreover, the Board confirmed that it considered these sources and did not limit its analysis to the two excerpts quoted in Telit's Opening Brief (at BB22-23) because the Board stated that "[3GL] accounts for written description support on pages 8 and 12–13 of the

[RMTA].” Appx68. Therefore, Telit’s assertions of lack of sufficient written support fail (even if substantial evidence were the correct standard of review).[4]

### B. The Board Consistently Applied Its Construction Of “an additional transport block size” To Prior Art

Telit asserts that the Board inconsistently applied its construction because it cannot argue that the asserted prior art references disclose sending other (or second) transport block size(s). *See* BB23-26; BB36. But there is no doubt that the Board applied its construction consistently. As discussed above, the ’388 patent’s specification and the two applications to which it claims priority disclosed use of other (second) TB size(s) different from the 168-bit TB size to which UEs were restricted for sending RRC messages of SRB0 via CCCH under then-current 3GPP standards (including TS-25.331), and this is exactly the type of written support the Board sought in connection with claims 66 and 74. *See supra* Argument.II.A. And Telit admits that the Board analyzed whether TS-25.331, Bannister, and Beckmann disclosed use of other (second) TB sizes. BB24. Thus, there was no error or

[4] Telit’s references to the Board’s preliminary findings in the Institution Decision regarding TS-25.331’s teachings are beside the point because they were made on a limited record, concerned the original claims, and had been superseded or augmented by the FWD. *See* Appx523. Notably, however, Telit effectively admits that the Board in the Institution Decision found that Telit made the initial showing *only* that TS-25.331 taught RLC sizes, and a number of TBs, but *not* a TB size. *See* BB18. Similarly, nowhere in the FWD did the Board find that TS-25.331 shows transmitting a TB size/an additional TB size. *See* Appx35.

inconsistent treatment in the Board's analyses of written description and invalidity. *See Acceleration Bay, LLC v. Activision Blizzard, Inc.*, 908 F.3d 765, 776 (Fed. Cir. 2018).

Telit also alleges that the Board's inconsistent application was influenced by 3GL's "shifting" position. BB24. The record shows otherwise.

Telit argues that, in the MTA, 3GL claimed "additional" could mean any transport format that was merely different from the existing transport formats. BB24 (citing Appx641-642). However, 3GL did not speak of vague "merely different" transport formats. In the cited portion of the MTA, 3GL explained with specificity that TS-25.331 restricted UE to always using the first TB size of the selected PRACH, and therefore restricted the size of messages to 168 bits. Appx641. 3GL also explained that TS-25.331 did not teach or suggest selecting the new additional configuration or transmitting a message using an additional configuration and that Telit pointed only to existing data structures that included existing transport formats. Appx641-642.

Next, Telit argues that 3GL in the RMTA discussed different block sizes larger than 168 bits, and then at the hearing provided "a more specific meaning of 'additional' to mean a *second* [TB] size transmitted to the UE in addition to an originally transmitted [TB] size . . . ." BB24-25 (citing Appx935-937) (emphasis original). There is no inconsistency here because the specification discloses using

other, additional TB sizes to transmit messages larger than 168 bits. In the RMTA, 3GL explained that the then-current standard allowed the UE to use the first transport format that is listed for the selected RACH, that that format could carry only one 168-bit TB, and that it would be beneficial to "use *also* [i.e., in addition] other [TB] sizes." Appx936 (quoting Appx119-120 (6:62-7:5)). And this is exactly what 3GL's counsel represented to the Board at the oral hearing. Appx1483-1484 (39:21-40:9).

Indeed, it was Telit, and not the Board, that took an inconsistent position on the construction of the term "an additional transport block size." Telit asserted that this term was ambiguous and indefinite as part of its lack-of-written-support argument (Appx991), but then argued that the term signifies a "mere size increase, e.g., from 168 bits to a larger number of bits" when opposing the revised substitute claims as obvious based on TS-25.331 (Appx976).

Telit cites to three opinions of this Court (*Phillips*, *Superguide*, and *Liebel-Flarsheim*) to argue without substantive explanation that they are relevant here to demonstrate the Board's error in applying its construction. BB26. However, Telit does not challenge the Board's construction of this term or argue that the Board improperly imported a portion of the specification into claims 66 and 74. And if Telit implies that there is a factual similarity, the cited cases undermine its arguments because they all dealt with situations where the specifications contained detailed descriptions of the inventions that were not reflected in the claims. *See Phillips v.*

*AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*); *Superguide Corp. v. DirecTV Enterprises, Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004); *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004). Contrary to Telit's argument, the Board's citation to these cases when considering the scope of the original claims in the '388 patent also does not support Telit's position because the Board concluded that the invention was described but not properly claimed in the original claims—a shortcoming that 3GL overcame in the RMTA to the Board's satisfaction. *See* Appx20.

### C. The Written Description Supports "another message" And "a message preceding the another message" Recited In Dependent Claims 69 And 77

The Board held that dependent claims 69 and 77 were adequately supported by the written description, including the fourth embodiment and Figure 15 of the '388 patent, after concluding, among other things, that:

> [T]he RRC Connection Setup message is the "first message"; the RRC Connection Setup Complete message is the second message; the RRC Connection Request message is the "another message"; and the Initial Direct transfer message (not shown [in Figure 15]) preceding the RRC Connection Request message is the "message preceding the another message."

Appx70. The fourth embodiment that the Board considered is described in the specification as follows:

> A fourth embodiment allows *a new message format* to be utilized. *The new message format may be adapted to*

> *include only the most necessary data.* For example, the START values may be omitted in an RRC Connection Request message since the START values are also transmitted in the Initial Direct transfer message.

Appx123 (13:18-23); *see also* Appx2228 (¶ 128). Figure 15 also shows a sequence of some of the messages between the UE and UTRAN:

**FIG. 15**




Appx114; Appx2255. 3GL also directed the Board to, among other things, the following portions of the file wrapper for additional written support: Appx2232 (¶ 144-147); Appx2229 (¶ 131); Appx1994-1995 and Figure 10. *See* Appx927; Appx931-932; *see also* Appx1074; Appx1479 (35:1-3).

Further, as 3GL explained below, a POSITA would understand that data is "omitted" because it may already have been transmitted or will be transmitted again, is unnecessary, not used, or unneeded. Appx1077. And LG explained to 3GPP as part of the proposal to incorporate the '388 patent's inventions into TS-25.331 that "[t]he transmission of [START] values for CN domains that have no RBs

configured, and that are not used for the 'LATEST CONFIGURED CN DOMAIN' *are not used, and take unnecessarily space* . . . ." Appx4384. Thus, the disclosure supports not only that "the most necessary data" may be contained in a message preceding a message from which it is omitted, but also that the most necessary data may be contained in a message following a message from which it is omitted. This disclosure satisfies the written description requirement, even though it does not describe the inventions using the exact same words. *See Lockwood*, 107 F.3d at 1572.

None of Telit's arguments that claims 69 and 77 lack written description support have merit. First, Telit argues that the specification does not disclose that the START values are contained in any message "preceding" the message in which they are omitted. BB30. However, as explained above, the '388 patent's specification discloses that "[t]he new message format may be adapted to include only the most necessary data" (Appx123 (13:19-20)), and there is additional support from other parts of the prosecution history. A POSITA would understand that START values may be omitted in the message that follows a preceding message carrying START values and vice versa. *See* Appx1074; Appx1479 (35:1-3); Appx1077; Appx4384.

Second, Telit argues that TS-25.331 contradicts the '388 patent's disclosure because the Initial Direct Transfer Message can take a different place in the message

sequence. BB30. However, TS-25.331's teachings are beside the point—when evaluating written description, courts look within the four corners of the disclosure. *See Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010); *Koller*, 613 F.2d at 821; *Wertheim*, 541 F.2d at 261. Additionally, this evidence was not "unrebutted." 3GL had already shown that TS-25.331 considers START values in the Initial Direct Transfer message in isolation from START values in the RRC Connection Setup Complete message. *See* Appx1077-1080.

Third, Telit argues that the sequence of messages recited in claims 69 and 77 contradicts the message sequence described in the '388 patent's specification and that the Board neglected to consider the "causal relationship between the communications recited in the claims." BB30. According to Telit, the correct sequence of messages is ABCD (first message, second message, message preceding another message, another message) and that 3GL erroneously asserted that the sequence was CDAB (message preceding another message, another message, first message, second message). *See* BB21.

This argument was forfeited, however, because it was not raised below and contradicts Telit's previous position. *See Omega Patents*, 920 F.3d at 1343. In its Opposition to the RMTA, for instance, Telit argued three points: (i) that "[t]he specification does not disclose a *second* message adapted to omit one or more START values" (Appx987-989); (ii) that the '388 patent's specification and Figure

15 did not provide support for four messages in claims 69 and 74 (Appx977; Appx989-990); and (iii) that the prosecution history contained a single mention of omitting START values (Appx978). Telit's first (main) point is the relevant one here and was based on its erroneous assumption that 3GL in the RMTA proposed adding the limitation "omitting START Values . . . in the *second* message" to claims 69 and 74, like in the MTA, when in fact 3GL revised proposed claims 69 and 74 following the BPG. Appx927; Appx931-932. Thus, Telit cannot now argue that there is lack of written support for the limitation "wherein omitting data includes omitting START values transmitted in a message preceding the *another* message."

Additionally, through its assertions in support of its first point below, Telit admitted that the specification supported the CDAB sequence:

| **Message** | **FWD** | **Telit's Opposition to the RMTA** |
|---|---|---|
| Initial Direct transfer message (not shown [in Figure 15]) | "message preceding the another message" | "Initial Direct Transfer Message is not described in the prosecution history as a first message [as defined in the claim]. It is only indicated as being transmitted with START values. So, no description of the Initial Direct Transfer Message being a first or second message . . . ." Appx989. |
| RRC Connection Request | "another message" | "RRC Connection Request message, the only message that is described as omitting START |

| | | |
|---|---|---|
| | | values in the fourth embodiment of the '388 patent cannot be the second message." Appx989.<br>"According to the teachings in the prosecution history, it is impossible for the RRC Connection Request to be the second message in claims 69 and 77 when the prosecution history teaches RRC Connection Request must occur before the first and second messages. This is also supported by the specification." Appx988. |
| RRC Connection Setup | "first message" | "The claimed first message, according to Fig. 15, is the RRC Connection Setup message (that indicates available PRACH configurations) received at the UE from the UTRAN." Appx988. |
| RRC Connection Setup Complete | "second message" | "The claimed second message, as shown in Fig. 15, is the RRC Connection Setup Complete message and not the RRC Connection Setup message." Appx988. |

Last, Telit's assumption that the "another message" and the "message preceding the another message" must follow the "first message" and the "second message" is wrong. BB33. The plain language of the claims shows only that the "second message" follows the "first message", and the "another message" must follow the "message preceding the another message." Appx927; Appx931. As the

Board correctly found in the FWD, however, the "first message" does not have to be "first" in time. "First" is simply a designation in the claim for identification purposes. Appx73.

## III. THE SUBSTITUTE CLAIMS ARE PATENTABLE OVER PRIOR ART

As an initial matter, there is no dispute that the Board correctly construed the limitation "an additional transport block size" to mean other (or in Telit's words, second) transport block ("TB") size. Appx81; *supra* Argument.II.A. Applying this undisputed construction to the asserted prior art, the Board correctly held that TS-25.331 neither anticipated nor rendered obvious the revised amended claims because it did not teach or suggest transmitting to the UE an additional TB size in the first message (as required by independent claims 66 and 74) but merely disclosed that the UE can calculate the TB size from the RLC size value. Appx80-81. The Board also correctly held that all other obviousness grounds based on TS-25.331 combined with Bannister and/or Beckmann failed for the same reasons and because those references disclosed the same treatment of the TB size as TS-25.331. Appx82-85. Therefore, the Board's decision upholding all revised claims as valid and allowed should be affirmed.

### A. The Board Correctly Held That Claims 66 And 74 Are Not Anticipated Or Obviated By TS-25.331

#### 1. TS-25.331 Does Not Anticipate Claims 66 And 74

The Board correctly focused on key elements distinguishing TS-25.331 from claims 66 and 74 when it found no anticipation:

> The proposed substitute claims require actual sending of the "additional transport block" in the first message, not just being able to determine or set the "additional transport block size" based on information transmitted in the first message.
> . . .
> Furthermore, proposed substitute claims 66 and 74 require transmission of "additional transport block size," not just "a transport block size." The term "additional transport block size" plainly requires that there be one other transport block size, with respect to which the transmitted "additional transport block size" is deemed "additional." In this regard, Petitioner has provided no explanation or accounting for that one other transport block size.

Appx80-81.

The Board's conclusion that TS-25.331 does not anticipate claims 66 and 74 is well-supported. Claim 66 recites, in pertinent part, *transmitting*, *i.e.* actual sending, of "an *additional* transport block size" in the first message *from the RNC* to the UE as part of at least one available configuration. Appx925-926.[5] In contrast, TS-25.331 does not teach that action. Rather, TS-25.331 teaches that TB size is calculated at the UE based on the values of RNC size and MAC header. For

[5] Claim 74 recites a system for performing claim 66's method. Appx929-930.

example, TS-25.331 discloses that the UE may calculate TB size according to these formulas:

> 4> for transport channels other than DSCH calculate the transport block size for all transport formats in the TFS using the following:
>
> TB size = RLC size.
>
> 4> for DSCH transport channels calculate the transport block size for all transport formats in the TFS using the following:
>
> TB size = RLC size + MAC header size
> if “RLC size” <> 0,
> TB size = 0 if “RLC size” = 0

Appx2355; *see also* Appx2354. This is consistent with the ’388 patent’s disclosure that the TB size of the physical layer “is defined by the RLC PDU size and the MAC header size[]” (Appx119 (6:13-14)), but does not disclose the novel and non-obvious methods and systems of transmitting control information recited in claims 66 and 74.

Nor does TS-25.331 teach transmitting “the information including additional transport format information for the CCCH comprising *an additional* transport block size.” This is evident, for example, from the fact that the ’388 patent’s inventions were folded into a much later version (TS-25.331 v.6.6.0) at LG’s request. Appx697-708. Indeed, the asserted version of TS-25.331 just teaches conventional methods and systems and deals only with conventional information elements, such as core network information elements (Section 8.6.1), UTRAN mobility information elements (Section 8.6.2), UE information elements (Section 8.6.3), radio bearer

information elements (Section 8.6.4), transport channel information elements (Section 8.6.5), physical channel information elements (Section 8.6.6), and measurement information elements (Section 8.6.7). Appx4292-4293 (¶ 78); Appx2353-2362; Appx2269-2271.

Anticipation requires that a single prior art reference describe every element of the claimed invention arranged as in the claim. *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008). Because TS-25.331 does not disclose any of these elements arranged in the same way as in claims 66 and 74, it does not anticipate. Thus, the Board's finding of no anticipation should be upheld.

Telit's arguments to the contrary are unavailing. First, Telit now argues that TS-25.331 anticipates because it discloses that the TB size is sometimes calculated to be equal to the RLC size. BB37. However, claims 66 and 74, among other things, require *transmitting* in the first message from RNC (and not calculating at the UE) an *additional* TB size, which TS-25.331 does not disclose. The Board correctly dismissed this argument after reasoning that:

> There are different ways to determine the transport block size, and proposed substitute claims 66 and 74 require a particular way, that it be transmitted in the first message. Petitioner's accounting leads to identification of the same transport block size but the accounting does not satisfy the specific way required by these claims.

Appx81.

Second, Telit argues that because in certain situations TB size equals RLC size, no calculation was required to determine TB size, and thus TS-25.331 inherently anticipated claims 66 and 74. BB37-38. As with many of Telit's arguments, though, this argument was forfeited because Telit did not argue before the Board that calculations were not required to determine TB size. *See Omega Patents*, 920 F.3d at 1343. Rather, in the Opposition to the MTA, Telit argued that TB size "can be directly related" to RLC size (Appx773) because TB size can be calculated according to the following formulas:

TB size = RLC size + MAC header size if "RLC size" <> 0,

TB size = 0 if "RLC size" = 0,

and

3> in FDD . . .TB size = RLC size.

Appx773-775. Similarly, in its Opposition to the RMTA, Telit never asserted that no calculation is involved and highlighted the word "calculate" in the following excerpt:

> 3> for TDD calculate the transport block size for all transport formats in the TFS using the following:
> TB size = RLC size.

Appx974. Thus, it cannot raise this argument now.

Additionally, TS-25.331 clearly teaches that TB size is "calculated" from other values and not transmitted to the UE in the first message as recited in claims

66 and 74. The very same excerpts from TS-25.331 on which Telit relied disclose mathematical formulas and use the word "calculate" in connection with TB size. Appx773-774; Appx974-975; *see also* Appx80 (finding that "TS-25.331 includes multiple formulas to calculate or determine the transport block size from information contained in the received message"). Thus, TS-25.331 does not contain a disclosure identical to claims 66 and 74. *See Net MoneyIN*, 545 F.3d at 1369.

To overcome this flaw in its argument, Telit essentially asks the Court to construe—for the first time—the term "calculate" based on an entry in the online version of the *Merriam-Webster Dictionary* (which is not even from the pertinent priority date timeframe). *See* BB37 n.5. Telit also asserts that "one might say that 3 + 2 are calculated to be 5, but it is nonsensical to say that 5 is calculated to be 5." BB37. Even if the Court entertains this entirely new argument (which has been forfeited), TS-25.331 does not state that TB size = TB size, and even if it did, this does not account for transmitting. Plus, Telit also still fails to account for the "an additional" TB limitation. Appx81.

Third, Telit argues that "[a]t the hearing, the Board did not question that the [TB] size could be equal to RLC size or that setting [TB] size based on RLC size did not require any calculation." BB38 (quoting Appx1485). However, the transcript of the hearing shows the opposite—one APJ simply assumed that often the block size would not be equal to the RLC size. Appx1485 (41:12-15). This only confirms

that the TB size is calculable from the RLC size, as the Board acknowledged in the FWD (Appx81), which is not enough for anticipation.

### 2. TS-25.331 Does Not Render Obvious Claims 66 And 74

The Board correctly held that, because TS-25.331 did not teach or suggest transmitting an additional TB size, TS-25.331 does not render obvious claims 66 and 74. Appx81; *see supra* Argument.III.A.1. The Board also correctly dismissed Telit's contention that it would have been obvious to a POSITA that the RLC size value transmitted from the network side *could be* used for the additional TB size, and explained that the correct question is whether a POSITA "had reason to make the modification required to arrive at the claimed invention, and not just 'could have' made the modification." Appx82.

Telit's three arguments to the contrary are unavailing. First, Telit argues that the Board erred because it would have been "trivially obvious" to transmit the TB size, at least in the situations where the RLC size is not the same as the TB size. BB39. To begin, Telit ignores that claims 66 and 74 require "an additional" TB size and not simply a TB size (Appx926), and Telit does not assert that it would have been trivially obvious to transmit an additional TB size (which it would not have been). *See* BB39-40.

Furthermore, as explained above, at the time of the invention, the first transport format of a RACH was limited to one 168-bit TB (Appx120 (7:1-2)), and

legacy UEs did not support use of another TB size in the PRACH (Appx120 (8:48-49)). Therefore, simply transmitting an additional TB size to legacy UEs (instead of transmitting new and legacy configurations), as Telit suggests, would only disrupt legacy UEs' operations. Appx120 (8:45-51). Thus, claims 66 and 74 do more than yield predictable results. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 416 (2007); *W. Union Co. v. MoneyGram Payment Sys.*, 626 F.3d 1361, 1369 (Fed. Cir. 2010).

Second, Telit argues that the '388 patent does not suggest any improvements to transmitting an additional TB size. BB40. An improvement, however, is the ability to send messages exceeding 168 bits, while at the same time not impacting the operation of legacy UEs. Appx120 (8:52-58). 3GPP certainly recognized the value of these improvements because it included them in a later version of TS-25.331 after LG revealed them. *See* Appx697-708.

Third, Telit argues that Dr. Olivier (its expert) provided purportedly "unrebutted testimony" that a POSITA would have been capable of substituting transmission of the TB size for the RLC size with predictable results. BB40-41. As an initial matter, Telit does not cite to Dr. Olivier's "unrebutted testimony," so there is no opportunity to respond to it (even if it did exist—which it does not). In any event, the Board acknowledged considering Dr. Olivier's relevant testimony before dismissing it because "[his] testimony shows what we already recognize, that

transport block size can be set by the receiving unit to equal the transmitted and received RLC size, not that the transport block size is itself transmitted." Appx81. In other words, any relevant testimony was considered, rebutted, and (correctly) rejected.

### B. The Board Properly Considered Bannister's Disclosure

The FWD clearly shows that the Board properly considered and rejected Telit's arguments based on Bannister. At its heart, Telit's complaint on this point arises because it failed to challenge the revised proposed claims based on Bannister or address the fact that Bannister provided nothing more than a summary of an unspecified version of TS-25.331. The Board cannot be faulted for rejecting arguments not actually made and, regardless, coming to the correct conclusion.

As the Board correctly pointed out, Bannister is pertinent mostly to unamended portions of the claims (Appx83), and Telit never relied on Bannister substantively in its challenge of the amended claims otherwise (Appx972-973; Appx975), except for Ground 5 (Appx985), which the Board also addressed in the FWD (Appx83-84).[6] Indeed, Telit challenged based on Bannister only (i) the later-

[6] Substitute claims at issue—claims 66, 69, 73, 74, 77, and 81—correspond to the original claims 1, 4, 12, 33, 36, and 44, respectively. The Petition's Grounds 3 and 5, partially relying on Bannister, never challenged based on Bannister those elements of claims 1, 4, 12, 33, 36, or 44 that were later amended. In Ground 3, the Petition provided no new substantive argument at all for claims 1 and 12 (Appx322-323), claim 36 (Appx342), or claim 44 (Appx344), and no new argument based on Bannister for claim 4 (Appx323-324). For Ground 5—obviousness based on TS-

amended element [j] of claim 33 in Ground 3, and (ii) all revised amended claims in Ground 5. Appx341. For both, it argued merely that Bannister teaches the dynamic portion of a transport format that includes TB size and TB set size. Appx341; Appx985. The Board rightly dismissed this argument in the FWD and explained that it "at most" indicates:

> that the [TB] size need not be fixed, but may be altered or changed at some time. Even if so, that does not cure the above-discussed deficiencies of TS-25.331 with regard to the requirement that the additional [TB] size be transmitted in a first message received by a mobile terminal.

Appx84.

Additionally, Bannister is a summary of an unspecified version of TS-25.331 (*see* Appx4300 (¶ 93)), as Telit's Dr. Oliver admitted (Appx4238-4240 (55:7-57:16)). If Telit asserts that Bannister is the summary of TS-25.331 v6.1.0, it cannot do more than what the actual version of that standard could, and below Telit failed to show that Bannister contains any additional information compared to the asserted version of TS-25.331.

Next, Telit argues—again for the first time on appeal—that under the Board's unchallenged construction of the "additional transport block size" limitation, TS-

---

25.331 in combination with Bannister and Beckmann—Telit provided no substantive arguments as to any claims and generally referred the reader to earlier assertions. Appx370-371.

25.331 combined with Bannister anticipated or rendered obvious the amended portions of claims 66 and 74, as Telit's expert Dr. Olivier purportedly testified. BB42-43. This argument fails because, aside from having been forfeited by Telit since it was not made below, Telit cannot show which portion of Dr. Olivier's Second Declaration supports its argument. Telit's brief simply cites to Dr. Olivier's Second Declaration—over sixty pages long—generally. *See* BB43. Then Telit cites to Appx3145, *i.e.* page 40 of Dr. Olivier's Second Declaration, for support of the argument that "multiple (*i.e.*, 'additional') transport block sizes must be transmitted from time to time[]" and that "*each subsequent* transmission of a SIB5 includes 'additional' transport format information." BB43 (emphasis original). However, that page of Dr. Olivier's Second Declaration does not support that position. That page of the declaration contains a lengthy quote from Bannister about dynamic and semi-static portions of the Transport format set, and then the declaration states—erroneously—that a POSITA would conclude that an additional RLC size would be equal to the TB size. Appx3145 (¶ 109). These skeletal points were already properly rejected and, without any further explanation, were not properly raised in any event.

### C. Claims 66 And 74 Are Not Obvious In View Of TS-25.331 Combined With Beckmann

The Board correctly rejected Telit's obviousness arguments based on Beckmann by finding that the reference does not cure the deficiencies of TS-25.331 regarding the additional TB size requirement:

> [T]he cited portion of the [Beckmann] disclosure, i.e., column 3, lines 14–44 . . . at most indicates, consistent with the disclosure of TS-25.331 discussed above, that [TB] size is determinable from RLC size. The disclosure nowhere describes that transport block size is itself directly received by a mobile terminal in a transmitted first message as is required by proposed substitute claims 66 and 74.

Appx84. The Board's conclusions are not arbitrary, capricious, or an abuse of discretion and are reasonable and well-supported for the same reason as the Board's conclusions regarding TS-25.331. *See supra* Argument.III.A. Additionally, despite Telit's assertion (in the Petition's Ground 4) that Beckmann in combination with TS-25.331 teaches the later-amended element 1[f] because it discloses "dynamic parameters" (Appx357), Telit failed to show that a POSITA would have had a motivation to combine Beckmann with TS-25.331 (an independent ground for affirmance on this point).

The central idea of Beckmann is to restrict or fix logical channels and parameters. *See* Appx2620 (6:18-31) ("The basis of the present invention is the extension of RRC (re)configuration messages with the purpose of *restricting* the logical channels to be configured in such a manner that they can only use predetermined transport formats . . . ."); *see also* Appx2620 (6:37-54; 6:59-64). In contrast, the '388 patent allows a system to add, change, or modify, among other aspects, the parameters of the system, including, for example, TB size to suit a message of variable size, *i.e.*, to "*de-restrict" or "un-fix"* one or more aspects of the

system. Appx3948-3951 (¶¶ 44-48). That shows a lack of motivation to combine with a reasonable expectation of success. *See id.*

Telit argues that the Board erred because: (i) Beckmann discloses that "RRC configuration messages can be extended by including an additional information element in order to add a list of assignments of logical channels to the transport channels and transport formats[]"; and (ii) TB is a dynamic attribute, so it means indicating that an additional TB is available. BB44-45. Both arguments fail.

As an initial matter, Telit is wrong that Beckmann discloses that RRC configuration messages can be extended *in order to* add a list of assignments. BB44. On the contrary, Beckmann states only that: "[i]n order to extend an RRC (re)configuration message according to the present invention independently of other IEs, it is necessary to add a list of assignments of logical channels to the transport channels and transport formats." Appx2622 (9:47-51).

Further, as explained above, Beckmann's central idea is to restrict or fix logical channels and parameters. *See, e.g.*, Appx2620 (6:18-31). Even assuming that Beckmann discloses that the TB size need not be fixed (it does not), that would not be the same as transmitting the additional TB size in the first message. *See* Appx84. Indeed, the '388 patent discloses that TB size is a dynamic attribute (Appx119 (6:25-26)), yet the conventional methods and systems were restricted to a single TB size of 168 bits (Appx120 (7:1-5)).

### D. The Additional Limitations Of Dependent Claims 69 And 77 Are Not Obvious Over TS-25.331

The Board correctly held that Telit failed to show that TS-25.331 anticipated or rendered obvious claims 69 and 77 for the same reasons as with claims 66 and 74 from which they depend, *i.e.*, because TS-25.331 does not teach or suggest an additional TB size transmitted in the first message. Appx82-83; *see also supra* Argument.III.A. There are also several more reasons specific to claims 69 and 77.

To begin, TS-25.331 v.6.1.0 does not teach or suggest "omitting START values" because it expressly states that START values shall always be present in that version of the protocol, as is shown in the relevant excerpt from TS 25.331 reproduced below.

| | | | | | |
|---|---|---|---|---|---|
| START | OP | | START 10.3.3.38 | START value to be used in the CN domain as indicated in the IE "CN domain identity". This IE shall always be present in this version of the protocol. | |

Appx3091.

Next, claims 69 and 77 do not claim omitting START values generally, but only omitting START values transmitted in a message preceding the another message as part of utilizing the new format. Appx927; Appx931-932. Nowhere does TS-25.331 disclose a new configuration comprising utilizing a new message format. On the contrary, TS-25.331 discloses conventional message transmissions. *Supra* Argument.III.A.

Further, there is strong objective indicia of non-obviousness because 3GPP (the standards body that establishes UTRAN specifications) folded the inventions of the '388 patent into a much later version of TS-25.331 v.6.6.0. *See, e.g.*, *Leo Pharm. Prods. v. Rea*, 726 F.3d 1346, 1353, 1358-59 (Fed. Cir. 2013). This was done after much debate and considering alternative options of resolving the problem of sending larger messages without impacting legacy UEs. *See* Appx938-939; Appx697-708.

Telit's arguments to the contrary do not establish otherwise. Telit first argues that the Board failed to analyze obviousness of claims 69 and 77 separately from substitute independent claims 66 and 74. BB45. However, Telit effectively concedes that, in the BPG, the Board addressed Telit's contention that TS-25.331 obviates claims 66 and 74 because it purportedly discloses omitting START values. BB46. Specifically, the Board in the BPG found that Telit's reliance on START value calculation in TS-25.331 is misplaced because TS-25.331 teaches that (i) a new START value is calculated and used if a security mode command procedure has been successfully completed, and (ii) the latest transmitted START value for the CN domain is used if that procedure has not been successfully completed. Appx862. Accordingly, the Board concluded that "TS25.331 does not disclose that *both* the prior (latest transmitted) START value and a newly calculated START value *are usable together*, and, as such, also does not disclose *omission of one of these START values*." Appx862-863.

Telit's renewed opposition to the RMTA's revised substitute claims 69 and 77 did not add new substantive arguments regarding the language "omitting START values" compared to its original opposition to "omitting one or more START values." *Compare* Appx779-781, *with* Appx977-983. Telit cannot argue that it was unaware of evidence on which the Board's findings were based or the Board's reasoning in reaching its conclusion—thus, Telit forfeited any argument on those points. *See PersonalWeb Techs., LLC v. Apple, Inc.*, 848 F.3d 987, 992 (Fed. Cir. 2017).

Further, the Board was not required to analyze every dependent claim in the FWD after concluding that TS-25.331 does not obviate or anticipate the substitute independent claims 66 and 74. *See* Appx83. This is because claims 69 and 77 depend from those substitute independent claims and because the Board found that Telit failed to show that TS-25.331 taught or suggested all the limitations of claims 66 and 74. *See* Appx83.

Telit's second argument—that the '388 patent already shows that information such as that about neighboring cells is omitted—also fails. BB45-46. This disclosure comes from the patent and has nothing to do with TS-25.331. Also, the '388 patent does not characterize information about neighboring cells as "non-critical." *See* BB45. On the contrary, the '388 patent stresses that, under conventional methods, deleting the quality and timing information leads to failure to

maintain the connection or initiate a new call. Appx120 (8:35-39). Further, START values are omitted for a different purpose because they are omitted when "[t]he new message format [is] adapted to include only the most necessary data." Appx123 (13:19-20). Additionally, when START values are omitted from one of the messages, they are not lost but are still transmitted at a different time. For example, in the fourth embodiment of the '388 patent, "the START values may be omitted in an RRC Connection Request message since the START values are also transmitted in the Initial Direct transfer message." Appx123 (13:20-23).

Third, Telit argues that TS-25.331 teaches or suggests revised claims 69 and 77 because TS-25.331 designates START values as optional and because "it would have been obvious to omit an *optional* value that was already transmitted in a prior message." BB46. However, the version v6.1.0 of TS-25.331 on which Telit relies stresses that START values "shall always be present in this version of the protocol." Appx3091. Based on this page of TS-25.331, Telit's Dr. Olivier concluded that START values are optional, but his testimony rightly deserved no weight because he ignored this express language of TS-25.331 that does not fit Telit's position. *See* Appx3134 (reproducing tbl.10.2.16c from Appx3091).

Further, Telit is wrong (at BB46) that TS-25.331 teaches omitting START values in the Initial Direct Transfer Message because START values are transmitted in the RRC Connection Setup Complete message. On the contrary, Section 8.1.8.2

of TS-25.331 v6.1.0 titled "Initiation of Initial Direct transfer procedure in the UE" states:

> The UE shall, in the Initial Direct Transfer Message:
> . . .
> 1> *calculate the START according to subclause 8.5.9* for the CN domain as set in the IE "CN Domain Identity"; and
> 1> include the calculated START value for that CN domain in the IE "START".

Appx3090. Accordingly, the START values in the Initial Direct Transfer message are not omitted, but rather are derived from another calculation according to subclause 8.5.9. Appx1079; *see also* Appx1077-1079.

### E. Claims 73 And 81 Are Not Obvious Over TS-25.331

The Board correctly held that TS-25.331 does not anticipate or render obvious claims 73 and 81 at least for the same reason as with claims 66 and 74, *e.g.*, because TS-25.331 does not teach or suggest an additional TB size transmitted in the first message. Appx82-83; *see also supra* Argument.III.A. And Telit concedes that if the Court upholds claims 66 and 74 as valid, claims 73 and 81 depending from them should also be upheld. *See* BB47.

Telit now advances three new arguments regarding these specific claims not presented below. *See* BB47. None of them have merit, and at any event they are forfeited because they were not raised below. *See Omega Patents*, 920 F.3d at 1343.

First, Telit argues that the Board's holding should be reversed because the citation to the specification of U.S. App. No. 11/065,872 that issued as the '388 patent on which 3GL relied for written support "only refers to selecting an available configuration, and does not mention selecting a transport block size at all." BB47. It is beside the point for the obviousness analysis, however, whether the claims were sufficiently supported by the disclosure (which they were in any event, *see* Appx2229 (¶ 132)).[7] *See Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1308 (Fed. Cir. 2015) (obviousness and written description are distinct inquires). Moreover, the original parts of claims 73 and 81 recite selecting a configuration and not a TB size, while the amended portions recite determining additional transport format information and the included additional TB size based on the size of the second message. *See* Appx928; Appx933.

Second, Telit argues it showed that TS-25.331 teaches selecting the largest available RLC size based on a conventional calculation that in some situations RLC size equals the TB size. BB47 (citing Appx984; Appx3137). However, the underlying excerpt from TS-25.331 simply discloses different types of conventional calculations that may or may not include the size of the MAC header: for transport

[7] 3GL also directed the Board to a similar disclosure in U.S. App. No. 60/589,630 (Appx928; Appx933) and U.S. App. No. 60/576,214 (*id.* (citing Appx1944 ("A system that does the choice of . . . the block size . . . according to the size of the message to be transmitted"))).

channels other than DSCH, TB is calculated as "TB size = RLC size," while for DSCH, "TB size = RLC size + MAC header size" if the RLC size does not equal zero, or "TB size = 0" if the RLC size equals zero. Appx2355. Thus, this evidence has nothing to do with selecting the largest available RLC size.

## CONCLUSION

For the foregoing reasons, the Court should affirm.

December 4, 2023

Respectfully submitted,

DEVLIN LAW FIRM LLC

*/s/ Timothy Devlin*
Timothy Devlin
tdevlin@devlinlawfirm.com
Nadiia Loizides
nloizides@devlinlawfirm.com
1526 Gilpin Avenue
Wilmington, DE 19806
(302) 449-9010

*Attorneys for Appellee*
*3G Licensing, S.A.*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the relevant type-volume limitations of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it has been prepared in a proportionally spaced typeface in 14-point font and includes 13,914 words, excluding the parts exempted under those Rules.

*/s/ Timothy Devlin*
Timothy Devlin
tdevlin@devlinlawfirm.com
1526 Gilpin Avenue
Wilmington, DE 19806
(302) 449-9010

*Attorney for Appellee*
*3G Licensing, S.A.*